UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

FELICIA JEFFERSON,

       Plaintiff,

v.

CITY OF WEST PALM BEACH,
FLORIDA,

       Defendant.

_____/

### NOTICE OF REMOVAL

Defendant, City of West Palm Beach ("Defendant"), by and through its undersigned counsel, and pursuant to 28 U.S.C. 1441, *et seq.*, and General Civil Case Filing Requirements 5H of the U.S. District Court for the Southern District of Florida hereby files this Notice of Removal and in support thereof states as follows:

### BACKGROUND

1.    Plaintiff Felicia Jefferson ("Plaintiff") filed the complaint which is the subject of this Notice of Removal against Defendant in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County and subsequently served Defendant. Copies of the executed service of summons and the complaint are attached hereto as Exhibits A and B, respectively.

2.    Plaintiff asserts a claim against Defendant regarding alleged violations of the Civil Rights Act of 1964, in addition to alleged violations of "policy, and procedures of the ally's restroom ACT" and Fla. Stat. 509.221, which section is titled "sanitary regulations." Plaintiff also brings various tort claims.

Jefferson v. City of West Palm Beach
Case No. _____
Notice of Removal
Page 2 of 3

## STATUTORY BASIS FOR REMOVAL

3.      In any civil action brought in a State court of which the district courts of the United States have original jurisdiction, Defendant may remove the State court case to the district court "embracing the place where such action is pending." 28 U.S.C. 1441(a). The District Court for the Southern District of Florida embraces Palm Beach County, the locus of the pending State case.

4.      The United States District Courts have original jurisdiction for claims arising under laws of the United States, which would include Plaintiff's Civil Rights Act of 1964 claim. *See*, 28 U.S.C. 1441(b); 42 U.S.C. §2000(a) *et seq.*

5.      Any state claims Plaintiff attempts to bring are within this Court's supplemental jurisdiction as they form part of the same case or controversy as the federal claims when all claims revolve around Plaintiff's access to public facilities located at Currie Park. *See,* 28 U.S.C. §1367.

Respectfully submitted,

OFFICE OF THE CITY ATTORNEY
CITY OF WEST PALM BEACH
P.O. Box 3366
West Palm Beach, FL 33402
(561) 822-1375
(561) 822-1373 (facsimile)

By: /s/CHRISTOPHER VAN HALL
        Christopher Van Hall
        Assistant City Attorney
        Fla. Bar No. 102889

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 17th day of November, 2015, the foregoing was e-filed through the CM/ECF system of the U.S. District Court for the Southern District of

Jefferson v. City of West Palm Beach
Case No. _____
Notice of Removal
Page 3 of 3

Florida and a copy was sent by email and U.S. mail to Plaintiff as shown on the attached

service list.

By: /s/CHRISTOPHER VAN HALL
Christopher Van Hall
Florida Bar No. 102889

## SERVICE LIST

Felicia Jefferson
615 ½ 20th Street, Apt. 2
West Palm Beach, FL 33407
Feliciaur2specigal@gmail.com

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA**

16779

50 2015 CA 0 1 2 2 0 1 XXXX MB

DIVISION: _____

Felicia Jefferson
_____
PLAINTIFF(S)

VS.

The City Of West Palm Beach
_____
DEFENDANT(S)

RECEIVED

NOV 5 2015

CITY ATTORNEY'S
OFFICE

2015 NOV -3 AM 9:12
SHARON R. BOCK, CLERK
PALM BEACH COUNTY, FL
CIRCUIT CIVIL
CIVIL B

FILED

**SUMMONS
(PERSONAL SERVICE ON A NATURAL PERSON)**

TO DEFENDANT(S):

THE CITY OF WEST PALM
BEACH
ATTN Mayor Jeri Muio, and

ALTERNATE ADDRESS:

411 Clematis Street
West Palm Beach, Fl
33401

SERVED ___November___ M On ___5___ 20 _15_
OFFICE OF THE SHERIFF, PALM BEACH COUNTY, FL
_____
DEPUTY SHERIFF                    758    I.D. NO.

**IMPORTANT**

A LAWSUIT HAS BEEN FILED AGAINST YOU.  YOU HAVE <u>20 CALENDAR DAYS</u> AFTER THIS SUMMONS IS SERVED ON YOU TO FILE A WRITTEN RESPONSE TO THE ATTACHED COMPLAINT WITH THE CLERK OF THIS COURT.  A PHONE CALL WILL NOT PROTECT YOU.  YOUR WRITTEN RESPONSE, INCLUDING THE CASE NUMBER GIVEN ABOVE AND THE NAMES OF THE PARTIES, MUST BE FILED IF YOU WANT THE COURT TO HEAR YOUR SIDE OF THE CASE.  IF YOU DO NOT FILE YOUR RESPONSE ON TIME, YOU MAY LOSE THE CASE, AND YOUR WAGES, MONEY, AND PROPERTY MAY THEREAFTER BE TAKEN WITHOUT FURTHER WARNING FROM THE COURT. THERE ARE OTHER LEGAL REQUIREMENTS.  YOU MAY WANT TO CALL AN ATTORNEY RIGHT AWAY.  IF YOU DO NOT KNOW AN ATTORNEY, YOU MAY CALL AN ATTORNEY REFERRAL SERVICE OR A LEGAL AID OFFICE (LISTED IN THE PHONE BOOK).

IF YOU CHOOSE TO FILE A WRITTEN RESPONSE YOURSELF, AT THE SAME TIME YOU FILE YOUR WRITTEN RESPONSE TO THE COURT YOU MUST ALSO MAIL OR TAKE A COPY OF YOUR WRITTEN RESPONSE TO THE PLAINTIFF OR PLAINTIFF(S) ATTORNEY NAMED BELOW:

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Tammy Anton, Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing o call 711."**

EXHIBIT
A

IMPORTANTE

USTED HA SIDO DEMANDADO LEGALMENTE.  TIENE 20 DIAS CONTADOS A PARTIR DEL RECIBO DE ESTA NOTIFICACION PARA CONTESTAR POR ESCRITO LA DEMANDA ADJUNTA Y PRESENTARLA ANTE ESTE TRIBUNAL. UNA LLAMADA TELEFONICA NO LO PROTEGERA.  SI USTED DESEA QUE EL TRIBUNAL CONSIDERE SU DEFENSA, DEBE PRESENTAR SU RESPUESTA POR ESCRITO, INCLUYENDO EL NUMBERO DEL CASO Y LOS NOMBRES DE LAS PARTES INTERESADAS.  SI USTED NO CONTESTA LA DEMANDA A TIEMPO, PUDIESE PERDER EL CASO Y PODRIA SER DESPOJADO DE SUS INGRESOS Y PROPIEDADES O PRIVADO DE SUS DERECHOS, SIN PREVIO AVISO DEL TRIBUNAL.  EXISTEN OTROS REQUISITOS LEGALES.  SI LO DESEA, PUEDE USTED CONSULTAR A UN ABOGADO INMEDIATAMENTE.  SI NO CONOCE A UN ABOGADO, PUEDE LLAMAR A UNA DE LAS OFICINAS DE ASISTENCIA LEGAL QUE APARECEN EN LA GUIA TELEFONICA.

SI DESEA RESPONDER A LA DEMANDA POR SU CUENTA, AL MISMO TIEMPO EN QUE PRESENTA SU RESPUESTA ANTE EL TRIBUNAL, DEBERA USTED ENVIAR POR CORREO O ENTREGAR UNA COPIA DE SU RESPUESTA A LA PERSONA DENOMINADO ABAJO COMO PLAINTIFF/PLAINTIFF(S) ATTORNEY (DEMANDANTE O ABOGADO DEL DEMANDANTE):

_____
_____
_____

**"Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda.  Tenga la amabilidad de ponerse en contacto con Tammy Anton, 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

IMPORTANT

DES POURSUITES JUDICIARIES ONT ETE ENTREPRISES CONTRE VOUS.  VOUS AVEZ 20 JOURS CONSECUTIFS A PARTIR DE LA DATE DE L@ASSIGNATION DE CETTE CITATION POUR DEPOSER UNE REPONSE ECRITE A LA PLAINTE CI-JOINTE AUPRES DE CE TRIBUNAL.  UN SIMPLE COUP DE TELEPHONE EST INSUFFISANT POUR VOUS PROTEGER; VOUS ETES OBILIGE DE DEPOSER VOTRE RESPONSE ECRITE  AVEC MENTION DU NUMERO DE DOSSIER CI-DESSUS ET DU NOM DES PARTIES NOMMEES ICI, SI VOUS SOUHAITEZ QUE LE TRIBUNAL ENTENDE VOTRE CAUSE.  SI VOUS NE DEPOSEZ PAS VOTRE REPONSE ECRITE DANS LE RELAI REQUIS, VOUS RISQUEZ DE PERDRE LA CAUSE AINSI QUE VOTRE SALAIRE, VOTRE ARGENT, ET VOS BIENS PEUVENT ETRE SAISIS PAR LA SUITE, SANS AUCUN PREAVIS ULTERIEUR DU TRIBUNAL.  IL Y A D@AUTRES OBLIGATIONS JURIDIQUES ET VOUS POUVEZ REQUERIR LES SERVICES IMMEDIATS D@UN AVOCAT.  SI VOUS NE CONNAISSEZ PAS D@AVOCATS OU A UN BUREAU D@ASSISTANCE JURIDIQUE (FIGURANT A L@ANNUAIRE DE TELEPHONES).

SI VOUS CHOISISSEZ DE DEPOSER VOUS-MEME UNE REPONSE ECRITE, IL VOUS FAUDRA EGALEMENT, EN MEME TEMPS QUE CETTE FORMALITE, FAIRE PARVENIR OU EXPEDIER UNE COPIE DE VOTRE REPONSE ECRITE AU APLAINTIFF/PLAINTIFF(S) ATTORNEY @ (PLAIGNANT OU A SON AVOCAT) NOMME CI-DESSOUS:

_____
_____
_____

"Si ou se yon **moun ki enfim** ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte Tammy Anton, kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."

THE STATE OF FLORIDA:

TO EACH SHERIFF OF THE STATE: YOU ARE COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE COMPLAINT IN THIS LAWSUIT ON THE ABOVE NAMED DEFENDANT(S).

DATED: _____ NOV 03 2015

Sharon R. Bock,
Clerk of the Circuit Court

BY: _____
AS DEPUTY CLERK
AKIERA LIGHTSEY-SYLVAIN

IN THE CIRCUIT OF THE FIFTEENTH JUDICIAL
CIRCUIT, IN AND FOR PALM BEACH COUNTY, FLORIDA

To: The city of West Palm Beach

Attn: Mayor Jeri Muio , and

    Parks and Recreation

    411 clematis Street

    West Palm Beach, FL 33401 .

50 2015 CA 0 1 2 2 0 1 XXXX MB

From: Felicia Elizabeth Dawn Jefferson

    615 ½ 20th Street Apt 2

    West Palm Beach, FL 33407

~~Statement~~
~~Notice~~ of claim  (complaint)

As a citizen in the city of West Palm Beach in the county of Palm Beach in the

State of Florida I would like to state that I am applaud, frightened, and feeling discriminated against. I Felicia Jefferson am filing this tort complaint  to the city of West Palm Beach for the torts of fraud and intentional emotional distress. As a citizen of the community I frequently visit the park known as Currie Park. I visit the museum, I fish on the different piers and I sometimes find a shade tree and read or take a nap. However, my complaint is regarding the bathrooms and how I am being treated as a human being; For the past 3 months I( July , August , September and October) I have experienced what I consider to be some form of discrimination; I have attempted to use the rest rooms located on the south side of the park  and they have been locked , but the signs on the door show that they should be open  from 7;30 am to 10:am and then again in the afternoon. Each time I have attempted to go to the restroom both in the mornings after 7:30 am and before 10:00 an in the afternoon I have not been able to do that because the doors were locked.  I am a lady and I have urinated on myself and have defecated on myself and can never wash my hands in the bathroom and on the far north of the park because soap and hand towels are not available sanitation is a big factor I believe there is a certain duty of care that I as a citizen am entitled to. I am feeling insecure about even being a black person, because after all that we have been through as a race it is a severe emotional attack on the very thing that I understand about overcoming racism or the abolishment of slavery.

Bathroom usage and water fountain usage and the ability to have cold water were  a major part of the civils rights movement led by so many of our black leaders. I also feel discriminated against and because of the social ills of our time; homelessness is an issue in this area of the park and a lot of these people are black people, however, even if these people are homeless they have a right to a facility.  The museum is there and I patronize the museum and I would like to use the bathroom and I would like to be able to go to the rest room if I am fishing on the southside of the

EXHIBIT
B

park over where the Dr. Martin Luther King Jr. memorial is located. Especially if I have been there for hours fishing.

For this wrongful act and for the injury occurred of negligence fraud and intentional severe emotional distress I am filing a tort for the amount of $15,000.00 for the omission of the city of west palm beach to keep up with the policy, and procedures of the ally's restroom ACT, statutes 509.221, The Civil Rights Act 1964, sanitary regulations, as well as, the usage and accessibility and sanitation of the public restrooms at the curry park

**(Please see attached documents)**

Sincerely,

Felicia E. Jefferson

615 ½ 20th Apt 2

West Palm Beach, FL 33407

Feliciaur2special@gmail.com

561-507-3083

11/3/2015

PEDRO TIBANEAR
MY COMMISSION # FF 165529
EXPIRES: October 2, 2018
Bonded Thru Budget Notary Services

http://americanrestroom.org/pnr/  portable restrooms to be placed by the door of the closed restrooms

509.221   Sanitary regulations.—

(1)(a)   Each public lodging establishment shall be supplied with potable water and shall provide adequate sanitary facilities for the accommodation of its employees and guests. Such facilities may include, but are not limited to, showers, handwash basins, toilets, and bidets. Such sanitary facilities shall be connected to approved plumbing. Such plumbing shall be sized, installed, and maintained in accordance with the Florida Building Code as approved by the local building authority. Wastewater or sewage shall be properly treated onsite or discharged into an approved sewage collection and treatment system.
(b)   Each public food service establishment shall be supplied with potable water and shall provide adequate sanitary facilities for the accommodation of its employees. Such facilities may include, but are not limited to, showers, handwash basins, toilets, and bidets. Such sanitary facilities shall be connected to approved plumbing. Such plumbing shall be sized, installed, and maintained in accordance with the Florida Building Code as approved by the local building authority. Wastewater or sewage shall be properly treated onsite or discharged into an approved sewage collection and treatment system.
(2)(a)   Each public lodging establishment and each public food service establishment shall maintain public bathroom facilities in accordance with the Florida Building Code as approved by the local building authority. The division shall establish by rule categories of establishments not subject to the bathroom requirement of this paragraph. Such rules may not alter the exemption provided for theme parks in paragraph (b).
(b)   Within a theme park or entertainment complex as defined in s. 509.013(9), the bathrooms are not required to be in the same building as the public food service establishment, so long as they are reasonably accessible.
(c)   Each transient establishment that does not provide private or connecting bathrooms shall maintain one public bathroom on each floor for every 15 guests, or major fraction of that number, rooming on that floor.
(3)   Each establishment licensed under this chapter shall be properly lighted, heated, cooled, and ventilated and shall be operated with strict regard to the health, comfort, and safety of the guests. Such proper lighting shall be construed to apply to both daylight and artificial illumination.
(4)   Each bedroom in a public lodging establishment shall have an opening to the outside of the building, air shafts, or courts sufficient to provide adequate ventilation. Where ventilation is provided mechanically, the system shall be capable of providing at least two air changes per hour in all areas served. Where ventilation is provided by windows, each room shall have at least one window opening directly to the outside.
(5)   Each transient public lodging establishment shall provide in the main public bathroom soap and clean towels or other approved hand-drying devices and each public lodging establishment shall furnish each guest with two clean individual towels so that two guests will not be required to use the same towel unless it has first been laundered. Each public food service establishment shall provide in the employee bathroom and any public bathroom soap and clean towels or other approved hand-drying devices.
(6)   Each transient establishment shall provide each bed, bunk, cot, or other sleeping place for the use of guests with clean pillowslips and under and top sheets. Sheets and pillowslips shall be laundered before they are used by another guest, a clean set being furnished each succeeding guest. All bedding, including mattresses, quilts, blankets, pillows, sheets, and

comforters, shall be thoroughly aired, disinfected, and kept clean. Bedding, including mattresses, quilts, blankets, pillows, sheets, or comforters, may not be used if they are worn out or unfit for further use.

(7)   The operator of any establishment licensed under this chapter shall take effective measures to protect the establishment against the entrance and the breeding on the premises of all vermin. Any room in such establishment infested with such vermin shall be fumigated, disinfected, renovated, or other corrective action taken until the vermin are exterminated.

(8)   A person, while suffering from any contagious or communicable disease, while a carrier of such disease, or while afflicted with boils or infected wounds or sores, may not be employed by any establishment licensed under this chapter, in any capacity whereby there is a likelihood such disease could be transmitted to other individuals. An operator that has reason to believe that an employee may present a public health risk shall immediately notify the proper health authority.

(9)   Subsections (2), (5), and (6) do not apply to any facility or unit classified as a vacation

# Equal Access to Public Accommodations

Although integrating the nation's schools was the first priority of the civil rights movement, the denial of equal access to public accommodations affected all blacks, not just students. Blacks could not use restaurants, bathrooms, water fountains, public parks, beaches, or swimming pools used by whites. They had to use separate entrances to doctor's offices and sit in separate waiting rooms. They could only sit in the balcony or in other designated areas of theaters. They had to ride at the back of streetcars and buses.

View fullscreenWashington Afro-American newspaper (VHS)More informationOn July 14, 1944, Irene Morgan boarded a bus from Gloucester, Virginia, to Baltimore and was passing through Richmond when she was told she was defying Virginia's 1930 law segregating seating by rows. She refused to move and was ejected. A state court rejected her argument, but in 1946 the U.S. Supreme Court ruled 7–1 that Virginia had no right to impose segregation

beyond its borders. Segregation on interstate bus travel was ended. It took Rosa Parks's similar refusal in Birmingham, Alabama, in 1955 to extend the same principle to bus travel within a state.

In 1960, in *Boynton* v. *Virginia*, the Supreme Court extended the *Morgan* ruling to bus terminals used in interstate bus service. Nonetheless, many African Americans were ejected or arrested when they tried to integrate such facilities. In 1961, hundreds of volunteers from across the country traveled to the South to test compliance with the *Boynton* decision by riding from Washington, D.C., to New Orleans. Known collectively as the Freedom Riders, they encountered little opposition beyond words as they traveled through Virginia. Violent resistance, however, was encountered from South Carolina to Alabama, where buses were set on fire.



View fullscreenLunch counter sit-in, Arlington, 1960 (AP)More informationStudents urged that the focus of struggle turn to nonviolent direct action in the streets rather than legal battles in courtrooms. The lunch counter sit-ins began in 1960. Martin Luther King encouraged this "revolt against the apathy and complacency of adults in the Negro community, against Negroes in the middle class who indulge in buying cars and homes instead of taking on the great cause that will really solve their problems." The sit-in tactic was borrowed from the labor movement, where it was used successfully in the late 1930s in the auto and steel industries. Workers sat down on the job, preventing management or replacement workers from resuming production. At

lunch counters, protesters—mostly black and white students—occupied seats on the principle "sit until served." They were not served, but as the seats were occupied, neither were any whites, and the businesses lost money. By the end of 1961, Woolworth's and other chain stores had desegregated their lunch counters. However, not all store owners gave in. It took the Civil Rights Act of 1964 to ban racial segregation "by businesses offering food, lodging, gasoline, or entertainment to the public."



Enter Fullscreen More information
Norton All-Stars Little League baseball team, 1951



Enter Fullscreen More information
Sit-in, Farmville, 1963



Enter Fullscreen More information
Lunch counter sit-in, Richmond, 1960



Enter Fullscreen More information
Protesting department stores in Richmond, 1960



Enter Fullscreen More information
Protesting in Richmond



Enter Fullscreen More information
Police with dogs at a Richmond demonstration



Enter Fullscreen More information
Student protest, Richmond, 1960



Enter Fullscreen More information
Woman protesting in Richmond



Enter Fullscreen More information
Televised debate, December 6, 1960

# Civil Rights Act of 1964

**QUICK FACTS**

**What is it?** A landmark piece of civil rights legislation.

**Significance:** Outlawed discrimination on the basis of race, sex, religion, color, or national origin.

**Date:** July 2, 1964

**Associated Sites:** The United States Capitol, The White House

The Civil Rights Act of 1964 is the nation's premier civil rights legislation. The Act outlawed discrimination on the basis of race, color, religion, sex, or national origin, required equal access to public places and employment, and enforced desegregation of schools and the right to vote. It did not end discrimination, but it did open the door to further progress.

Although the 13th, 14th, and 15th amendments outlawed slavery, provided for equal protection under the law, guaranteed citizenship, and protected the right to vote, individual states continued to allow unfair treatment of minorities and passed Jim Crow laws allowing segregation of public facilities. These were upheld by the Supreme Court in *Plessy v. Ferguson* (1895), which found state laws requiring racial segregation that were "separate but equal" to be constitutional. This finding help continue legalized discrimination well into the 20th century.

Following World War II, pressures to recognize, challenge, and change inequalities for minorities grew. One of the most notable challenges to the status quo was the 1954 landmark Supreme Court case *Brown v. Board of Education* of Topeka, Kansas which questioned the notion of "separate but equal" in public education. The Court found that "separate educational facilities are inherently unequal" and a violation of the 14th Amendment. This decision polarized Americans, fostered debate, and served as a catalyst to encourage federal action to protect civil rights.



Marshals standing by fence near crowd during the March on Washington, 1963
*Warren K. Leffler, LOC, LC-U9- 10381-23*

Each year, from 1945 until 1957, Congress considered and failed to pass a civil rights bill. Congress finally passed limited Civil Rights Acts in 1957 and 1960, but they offered only moderate gains. As a result of the 1957 Act, the United States Commission on Civil Rights was formed to investigate, report on, and make recommendations to the President concerning civil rights issues. Sit-ins, boycotts, Freedom Rides, the founding of organizations such as the Student Nonviolent Coordinating Committee (SNCC) and the Southern Christian Leadership Conference (SCLC), local demands for inclusion in the political process, all were in response to the increase in legislative activity through the 1950s and early 1960s.

1963 was a crucial year for the Civil Rights Movement. Social pressures continued to build with events such as the Birmingham Campaign, televised clashes between peaceful protesters and authorities, the murders of civil rights workers Medgar Evers and William L. Moore, the March on Washington, and the deaths of four young girls in the bombing of Birmingham's 16th Street Baptist Church. There was no turning back. Civil rights were firmly on the national agenda and the federal government was forced to respond.



President John F. Kennedy addresses the nation on civil rights, June 11, 1963

In response to the report of the United States Commission on Civil Rights, President John F. Kennedy proposed, in a nationally televised address, a Civil Rights Act of 1963. A week after his speech, Kennedy submitted a bill to Congress addressing civil rights (H.R. 7152). He urged African American leaders to use caution when demonstrating since new violence might alarm potential supporters. Kennedy met with businessmen, religious leaders, labor officials, and other groups such as CORE and NAACP, while also maneuvering behind the scenes to build bipartisan support and negotiate compromises over controversial topics.

Following Kennedy's assassination in November 1963, both Martin Luther King, Jr. and newly inaugurated President Lyndon B. Johnson continued to press for passage of the bill — as King noted in a January 1964 newspaper column, legislation "will feel the intense focus of Negro interest...It became the order of the day at the great March on Washington last summer. The Negro and his white compatriots for self-respect and human dignity will not be denied."

The House of Representatives debated H.R. 7152 for nine days, rejecting nearly 100 amendments designed to weaken the bill. It passed the House on February 10, 1964 after 70 days of public hearings, appearances by 275 witnesses, and 5,792 pages of published testimony.



President Lyndon B. Johnson signing the 1964 Civil Rights Act, July 2, 1964.
*Cecil Stoughton, White House Press Office*

The real battle was waiting in the Senate, however, where concerns focused on the bill's expansion of federal powers and its potential to anger constituents who might retaliate in the voting booth. Opponents launched the longest filibuster in American history, which lasted 57 days and brought the Senate to a virtual standstill.

Senate minority leader Everett Dirksen nurtured the bill through compromise discussions and ended the filibuster. Dirksen's compromise bill passed the Senate after 83 days of debate that filled 3,000 pages in the Congressional Record. The House moved quickly to approve the Senate bill.

Within hours of its passage on July 2, 1964 President Lyndon B. Johnson, with Martin Luther King, Jr., Dorothy Height, Roy Wilkins, John Lewis, and other civil rights leaders in attendance, signed the bill into law, declaring once and for all that discrimination for any reason on the basis of race, color, religion, sex, or national origin was illegal in the United States of America.